**NORFOLK SOUTHERN CORPORATION, et al., Plaintiffs,**

v.

**CHEVRON U.S.A., INC., et al., Defendants.**

**No. 3:00–cv–366–J–32MMH.**

United States District Court, M.D. Florida, Jacksonville Division.

Aug. 7, 2003.

James C. Rinaman, Jr., Marks, Gray, P.A., Jacksonville, FL, Michael C. Davis, Gary A. Bryant, Stephen Royce Jackson, Willcox & Savage, P.C., Norfolk, VA, for plaintiffs/counter-defendant.

John Finlay MacLennan, Tim Elsworth Sleeth, Smith, Hulsey & Busey, Richard L. Maguire, Rogers, Towers, Bailey, Jones & Gay, Jacksonville, FL, Reynold N. Hoover, Federal Emergency Management Agency, Washington, DC, Stephen J. Darmody, Shook, Hardy & Bacon, L.L.P., Miami, FL, for defendants/counter-claimant/cross-claimant/cross-defendant.

## ORDER

CORRIGAN, District Judge.

### I. Status

This case is before the Court on defendant Shell Oil Company's Motion in Limine to Exclude the Opinion Testimony of Mr. Wayne Grip, Dr. Paul Chrostowski and Dr. Marwan Sadat (Doc. 114) and supporting memorandum (Doc. 115) and plaintiffs' response thereto (Doc. 136); defendant Shell Oil Company's Motion for Summary Judgment (Doc. 116) and plaintiffs' response thereto (Doc. 135); defendant Chevron U.S.A., Inc.'s Motion for Summary Judgment (Doc. 118) and plaintiffs' response thereto (Doc. 137); defendant Chevron U.S.A., Inc.'s Motion for Summary Judgment on Crossclaim of Defendant Shell (Doc. 125) and supporting memorandum (Doc. 126) and Shell's response thereto (Doc. 134). The parties filed supporting materials (Docs. 119–24, 138).[1] On January 24, 2003, the Court conducted a hearing on all pending motions, the transcript of which has now been filed (Doc. 142).[2] The Court permitted the parties to file post-hearing supplemental memoranda which they have now done (Docs. 143–45). Plaintiffs attached expert verifications to their post-hearing memorandum (Doc. 144, Exhibits 2, 4–5). Defendant Shell Oil Company then filed a Motion to Strike the Plaintiffs' Late–Filed Expert Verification (Doc. 146) to which plaintiffs filed a response (Doc. 147).

### II. Standard of Review

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See id.* This burden "may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. *See* Fed. R.Civ.P. 56(e). To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct.

---

1. Doc. 119 is Defendant Chevron U.S.A., Inc.'s Notice of Filing in Support of Motion for Summary Judgment. These documents are contained in two boxes. Future reference to these documents will be to "Chevron Exhibit" followed by the applicable Bates Stamp number and any other pertinent information.

 Doc. 120 is deposition testimony of Wayne Grip; Docs. 121 and 122 are deposition testimony of A. Gayle Jordan; Doc. 123 is deposition testimony of Floyd L. Mathews, Jr.; and Doc. 124 is deposition testimony of Richard Henrichsen Sollner.

 Doc. 138 is an Appendix of Joint Exhibits to Plaintiffs' Memorandum of Law in Opposition to Chevron's Motion for Summary Judgment, Plaintiffs' Memorandum of Law in Opposition to Shell Oil Company's Motion for Summary Judgment and Plaintiffs' Memorandum of Law in Opposition to Shell Oil Company's Motion in Limine. These documents fill two boxes. Future references to these documents will be to "Plaintiffs' Joint Exhibit" followed by the applicable exhibit number and any other pertinent information.

2. References herein to specific transcript pages are denoted as "Tr." followed by the page number.

2505, 91 L.Ed.2d 202 (1986) (citations omitted).

### III. Background

Plaintiff Norfolk Southern Corporation ("NSC") is the parent corporation of Norfolk Southern Railway Company ("NSRC") which, in turn, is the parent corporation of plaintiff Georgia Southern and Florida Railway Company ("GS & F") (collectively referred to as "the plaintiffs"). Plaintiff GS & F is successor in interest to St. Johns River Terminal Company ("SJRTC").[3] Defendants Chevron U.S.A., Inc., ("Chevron") and Shell Oil Company ("Shell") are petroleum corporations. Chevron is successor in interest to Gulf Oil Corporation and Gulf Refining Company (collectively, "Gulf"), which were also petroleum corporations.[4]

Plaintiffs have filed a multi-count complaint against defendants Chevron and Shell (Doc. 57). Plaintiffs' claims are based on alleged contamination of property described as the "Site" and an adjacent salt marsh described as the "Adjacent Property" (hereinafter referred to as the "salt marsh").[5] See Doc. 57. The Site is located on the south bank of Long Branch Creek, a tributary of the St. Johns River, in Jacksonville, Florida. SJRTC (GS & F's predecessor) leased the Site to Gulf from 1906 until 1961.[6] Gulf operated a bulk oil storage and distribution facility on the Site. See Plaintiffs' Joint Exhibit 29 (hereinafter "Pretrial Stipulation"). Since Gulf vacated the property at the end of its lease in 1961, the Site has not been used as an oil distribution terminal. See id.[7] On the opposite bank of Long Branch Creek, Shell operated a similar type of oil distribution terminal from the 1930s until 1991. See Doc. 116 at 3. The Court has attached to the Order as Appendix A an aerial photograph depicting both properties.[8] As the photograph shows, the mouth of the Creek separating the Gulf and Shell properties is rather wide and there is also an isthmus of land which separates the Creek into two branches.[9]

---

3. On December 31, 1993, SJRTC merged into GS & F.

4. On August 12, 1985, Gulf changed its name to Chevron U.S.A., Inc.

5. The property has been referred to by different names in various documents—i.e. "Tallyrand Terminal Property," "Occidental/Gulf Oil Site" or "PCS Phosphate Site." The parties have submitted numerous aerial photographs and diagrams of the site, see e.g., Plaintiffs' Joint Exhibit 10 (Wayne Grip's Expert Report); Doc. 116, Exhibit A (Shell's Motion for Summary Judgment), and the Court has attached to this Order as Appendix A an aerial photograph of the subject location.
The Court recognizes that the parties dispute who owns the salt marsh and whether it was part of the leased premises. The Court's discussion of this issue is at pages 1263–64, infra.

6. SJRTC and Gulf entered into their first lease agreement on December 1, 1906 and subsequently renewed or entered into numerous other lease agreements until the parties finally terminated the lease on December 31, 1961. The lease renewals and lease agreements are attached as Exhibits 2(a)(h) to the Second Amended Complaint (Doc. 57).

7. PCS Phosphate Whitesprings has operated at this site since 1972. See Exhibit 27 (Metroplex Letter to RESD and FDEP dated January 14, 2000) to Plaintiff's Joint Exhibit 18 (Tiffany Shaw Deposition).

8. The Court has labeled the map with relevant information—i.e. the Gulf facility, Shell facility, salt marsh and the general location where the pipeline crosses Long Branch Creek.

9. The record is unclear as to the width of Long Branch Creek. Clarence Knapper, former superintendent of the Shell facility, testified that Shell used about 4,500 feet of pipeline to pump petroleum products across the Creek from the Gulf facility to the Shell facility. See Clarence Knapper deposition (Plaintiffs' Joint Exhibit 7) at 135. However, it is unknown how much of the pipeline ran under the Creek and how much ran on the two properties.

During World War II, the United States government took possession of Shell's terminal and in 1943 constructed two pipelines (6" and 8" inch in diameter) under the Creek surface connecting the Gulf terminal to the Shell terminal. *See* Exhibit 3 to Plaintiffs' Joint Exhibit 7 (Shell Oil Company's Supplementary Answer to Plaintiff's First Set of Interrogatories) & Plaintiffs' Joint Exhibit 33 (Lease Agreement between Shell and Defense Plant Corporation, December 3, 1942). Collectively, these two pipelines are referred to as the Florida Emergency Pipeline (hereinafter the "pipeline"). *See* Exhibit 3 to Plaintiffs' Joint Exhibit 7. After the war, the government sold its interest in the pipeline to Samson Tool and Machinery Company, which then sold the pipeline to Gulf and Shell. *See* Plaintiffs' Joint Exhibit 35 (Letter from Reconstruction Finance Corporation to Shell, May 1, 1946); Plaintiffs' Joint Exhibit 36 (Conveyance from Sampson Machinery & Supply Company to Gulf and Shell, February 10, 1948); Exhibit 3 to Plaintiffs' Joint Exhibit 7 (Shell Oil Company's Answer to Plaintiffs' First Set of Interrogatories). Gulf agreed to fifty percent ownership of the pipeline. *See* Joint Exhibit 37 (Letter from Shell to Gulf, January 27, 1948).[10] For about a year and a half, from 1946 through 1947 or 1948, while Shell constructed a dock on its own property, Gulf allowed Shell to operate two additional pipelines (10" and 12" in diameter) on the Site connecting Gulf's loading dock to the pipeline crossing Long Branch Creek. *See* Plaintiffs' Joint Exhibit 38 (License Agreement between Gulf and Shell, July 1946).[11] This enabled Shell to receive oil products by ship or barge at the Gulf dock and then have them transferred to Shell via the pipelines on the Site and the pipeline running under Long Branch Creek. The pipeline running under Long Branch Creek was abandoned by the parties and reported to be "rusted out" by 1957. Doc. 143, Exhibit A.[12]

In August 1977, the United States Coast Guard notified SJRTC that oil was seeping from the Site into Long Branch Creek. *See* Pretrial Stipulation at 6. SJRTC was cited for a violation of the Clean Water Act and fined $100. *See id.* SJRTC took various corrective measures to prevent further oil seepage into Long Branch Creek. In November 1978, SJRTC filed a lawsuit against Gulf alleging that during the term of its lease, Gulf had spilled petroleum products on the Site and had permitted them to seep into the subsurface of the Site damaging the property and causing the ultimate release of oil into Long Branch Creek (hereinafter the "first action"). *See* Doc. 123, Exhibit 1 at ¶¶ 5–

10. Shell contends that it subsequently sold its rights to the pipeline to Gulf in November 1953. *See* Exhibit 5 to Plaintiffs' Joint Exhibit 3 (Shell Oil Company's Answer to Plaintiff's First Set of Interrogatories). In response to Interrogatory Question 5(c), Shell stated that there is a May 26, 1954 Base Lease or Fee Data Notice that provides:

This digest issued to cancel old Notice No. B–768 dated 6–11–48 which covered one 6" and one 8" pipeline at Jacksonville Marine Terminal, owned jointly by Shell and Gulf Oil Corp. In February 1953, these items were written off and Shell sold its interest to Gulf in November, 1953.

The Court has not seen this document.

11. The record is unclear as to the precise date Shell stopped using the Gulf facility. In a letter dated September 2, 1947, Shell advised Gulf that it was canceling the license agreement effective March 2, 1948. *See* Exhibit 39 to Plaintiffs' Joint Exhibit 7. However, Shell noted that if construction of its dock was completed before March 2, 1948, it would cease using Gulf's facility at an earlier date. *See id.*

12. In an internal Shell memorandum dated February 11, 1957, J.C. Morris (a member of Shell's Real Estate and Development Department) described the pipeline as "abandoned and completely rusted out." Doc. 143, Exhibit A.

8.[13] SJRTC alleged that Gulf had breached the terms of the lease by refusing to indemnify SJRTC and for failing to return the Site in is as good condition as it had been in prior to Gulf's use. *See id.* at 4–10, 11–13. In April 1984, after almost five years of litigation, the parties settled the first action. *See* Chevron's Exhibit # R01456–57.[14]

Plaintiffs have continued to undertake efforts to prevent further releases of oil from the Site into Long Branch Creek. *See* Plaintiffs' Joint Exhibit 17 (Bryan Salley Deposition) at 23–24.[15] In December 1998, while installing a water wall to stop seepage into the Creek, plaintiffs discovered six (6) buried 55–gallon drums on the Site. *See id.* at 144–45 and Exhibits 13, 14, 15, 19. Further investigations have uncovered *inter alia* thirty (30) more drums buried at the site; buried metal ring foundations and substantial petroleum contamination in the salt marsh. *See id.* Plaintiffs recently rediscovered the pipeline running under Long Branch Creek which is broken on the Gulf side. *See* Plaintiffs' Joint Exhibit 18 (Tiffany Shaw Depo.) at 76–77 & Exhibits 29–32. Plaintiffs also excavated a large concrete structure beneath the ground surface on the Site identified as OW–8.[16]

On April 3, 2000, plaintiffs filed this action based on the newly discovered contamination on the Site and in the salt marsh.[17] The original complaint (Doc. 1) and the first amended complaint (Doc. 20) were brought solely against defendant Chevron. Plaintiffs subsequently filed a second amended complaint (Doc. 57) adding Shell as a defendant after rediscovering the pipeline in the salt marsh. Count One (Breach of Contract) is brought solely against Chevron. Count Two (Trespass), Count Three (Nuisance), Count Four (Negligence), Count Five (Common Law Contribution), Count Six (Statutory Contribution), Count Seven (Indemnification), Count Eight (CERCLA § 107), Count Nine (CERCLA § 113), Count Ten (Violation of the Florida Pollutant Discharge

13. The Complaint from the first action is located in several places in the record. It is attached as Exhibit 1 to Floyd Matthews, Jr.'s Deposition (Doc. 123). Future references to this complaint will be to "C." followed by the applicable page and/or paragraph number.

14. The Court will discuss the first action in greater detail in Part IV—"Chevron's Motion for Summary Judgment."

15. Bryan Salley is an engineer in environmental operations for Norfolk Southern. *See* Plaintiffs' Joint Exhibit 17 (Bryan Salley Deposition) at 7. During 1998 and 1999, Mr. Salley worked at the Site and was responsible for installing a water wall to prevent further oil seepage into Long Branch Creek. *See id.* at 9–10.

16. In June 2001, plaintiffs' contractor Metroplex Industries, Inc., supervised the excavation and removal of a large concrete structure located beneath the ground surface on the Site. The structure was previously identified as anomaly OW–8 during an electromagnetic survey in 1999. Metroplex described OW–8 as follows:

> The reinforced concrete floor was 40 feet in diameter and six inches thick, with a reinforced concrete wall three feet high and six inches thick. A four foot by four foot precast concrete sump was present in the center of the floor. In the northwest corner of the structure, two pipes were imbedded into the wall. Both pipes extended towards the marsh. The lowermost pipe passed through a bulkhead at the border of the salt marsh. On the salt marsh side of the bulkhead, the pipe had a valve and was broken beyond the valve. The uppermost pipe extended two feet from the wall towards the marsh and was broken off at that point. Water and petroleum sludge were observed by the field team to be flowing from the pipes.

Plaintiffs' Joint Exhibit 12 at 11.

17. To date, no governmental agency has actually ordered remediation of the salt marsh. Tr. 45–46.

Prevention and Removal Statutes, Florida Statute § 376 *et seq.*), and Count Eleven (Violation of Florida Statute § 403.727) are brought against both Chevron and Shell. Chevron and Shell cross-claimed against each other (Docs. 63 & 69) and Shell counterclaimed against plaintiffs (Doc. 63).

Shell has now filed a Motion for Summary Judgment (Doc. 116) and a related Motion in Limine to Strike expert opinion testimony of Mr. Wayne Grip, Dr. Paul Chrostowski and Dr. Marwan Sadat (Doc. 114) and a Motion to Strike Late–Filed Expert Verifications (Doc. 146). Chevron has filed a Motion for Summary Judgment (Doc. 118) and a Motion for Summary Judgment on Shell's Cross–Claim (Doc. 125). The Court is now prepared to issue its ruling on these motions.

### IV. Chevron's Motion for Summary Judgment

■ There appears to be little dispute that plaintiffs have discovered contamination on the Site and adjacent salt marsh. Both logic and the record evidence strongly suggest triable issues concerning Chevron's liability for the contamination because of the activity of its predecessor, Gulf, on the premises between 1906 and 1961. Indeed, Chevron does not argue that it is entitled to summary judgment because there are no material issues of fact regarding the contamination and Chevron's responsibility for it. Rather, Chevron raises several legal arguments, focusing primarily on its contention that the current litigation is barred by *res judicata* based on the previously filed first action. Tr. 12. Whether plaintiffs' action is barred by *res judicata* is a legal determination properly decided by the Court on a motion for summary judgment. *See Israel Discount Bank, Ltd. v. Entin*, 951 F.2d 311, 314 (11th Cir.1992).

As discussed *supra*, in November 1978, SJRTC filed the first action, a two-count complaint against Gulf in state court, based on the 1977 citation by the Coast Guard and SJRTC's subsequent clean up efforts. Gulf removed to this Court. In its complaint, SJRTC alleged that Gulf had spilled petroleum products on the Site and permitted them to seep into the subsurface of the leased property damaging the property and ultimately causing the release of oil into Long Branch Creek. *See C.* at ¶¶ 5–8. SJRTC alleged that Gulf had breached its obligations under the lease agreements by (1) refusing to indemnify and hold SJRTC wholly harmless from the consequences of Gulf's actions (*see id.* at ¶ 10); and (2) failing to surrender possession of the premises to SJRTC in as good a condition as the premises were prior to Gulf's use. *See id.* at ¶¶ 11–14. SJRTC sought damages against Gulf for costs and expenses already incurred, or to be incurred, in the restoration of the property or judgment requiring Gulf to restore the property to pre-lease condition. *See id.* at 3–4.

After almost five years of litigation, the parties settled the first action. On January 13, 1984, Gulf submitted a proposed release to SJRTC. This proposed release, entitled "RELEASE IN FULL OF ALL CLAIMS," released Gulf from any claims for "damage, loss or injury" sustained by SJRTC "in consequences of the occupation and use by" Gulf of the Site and "all those matters alleged" in the first action. *See* Plaintiffs' Joint Exhibit 15 (Affidavit of A. Gayle Jordan) & Exhibit 1 thereto. The proposed release also required SJRTC to indemnify Gulf for any claims brought based on Gulf's use of the Site. *See id.* SJRTC rejected the proposed release and the parties ultimately executed a release tailored more toward the specific allegations of the complaint in the first action (hereinafter the "Release"). *See* Plaintiffs' Joint Exhibit 15 (Affidavit of Gayle Jordan) at ¶¶ 15–16 & Exhibit 3. The Release provides:

In consideration of the payment of ONE HUNDRED SIXTY–THREE THOUSAND TWENTY–EIGHT and 26/100 DOLLARS ($163,028.26) to St. Johns River Terminal Company, in hand paid by Gulf Oil Corporation, St. Johns River Termianl [sic] Company does hereby release and forever discharge said Gulf Oil Company, its successors and assigns, from any and all actions, causes of action, claims and demands for, upon or by reason of any damage, loss or injury, which heretofore has been or which hereafter may be sustained by St. Johns River Terminal Company arising out of any contamination by oil of the Talleyrand Terminal property in Jacksonville, Florida, which is alleged to have occurred during Gulf Oil Corporation's use and occupancy of said property and all those matters alleged in St. Johns River Terminal Company, a Florida corporation vs. Gulf Oil Corporation, a Pennsylvania corporation, in the United States District Court, Middle District of Florida, Jacksonville Division, Case No. 79–10–Civ–J–16.

This release extends and applies to, and also covers and includes, all unknown, unforeseen, unanticipated and unsuspected injuries, damages, loss and liability, and the consequences thereof, arising out of said alleged oil contamination, as well as those now disclosed and known to exist. The provisions of any state, federal, local or territorial law or statute providing in substance that releases shall not extend to claims, demands, injuries or damages which are unknown or unsuspected to exist at the time, to the person executing such release, are hereby expressly waived.

It is further agreed and understood that said payment is not to be construed as an admission of any liability.

Doc. 57, Exhibit 3.

SJRTC and Gulf then filed a stipulation of dismissal. *See* Chevron Exhibit # R01456–57. On May 4, 1984, this Court approved the stipulation and entered an Order dismissing the first action with prejudice pursuant to Rule 41, Fed.R.Civ.P. *See id.* The Court's Order did not expressly incorporate the release executed by the parties.

 Under *res judicata*, which is also known as "claim preclusion," a final judgment on the merits bars the parties to a prior action from re-litigating a cause of action that was or could have been raised in that action. *See Davila v. Delta Air Lines Inc.*, 326 F.3d 1183, 1187 (11th Cir. 2003); *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir.2001) (citation omitted). Claim preclusion acts as a bar "not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact." *Pleming v. Universal–Rundle Corp.*, 142 F.3d 1354, 1356–57 (11th Cir.1998) (citation omitted).

 In the Eleventh Circuit, a party seeking to invoke *res judicata* must satisfy four elements: (1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action. *See Davila*, 326 F.3d at 1187; *Piper*, 244 F.3d at 1296.[18] The burden is on the party asserting *res judicata* to show that the later-filed

---

**18.** The Eleventh Circuit recently made clear that "federal preclusion principles apply to prior federal decisions, whether previously decided in diversity or federal question juris-

diction." *CSX Transp., Inc., v. Brotherhood of Maintenance of Way Employees*, 327 F.3d 1309, 1316 (11th Cir.2003).

suit is barred. *See Piper*, 244 F.3d at 1296.

As an initial matter, the parties dispute the *res judicata* effect of the judgment entered in the first action. Plaintiffs contend that because a consent judgment [19] resolved the first action, the Court cannot automatically apply claim preclusion; rather, the Court must consider the parties' intent in settling the first action. *See* Doc. 137 at 4–7. Chevron argues that a consent judgment is like any other final judgment and the parties' intent is irrelevant to the claim preclusion analysis. *See* Doc. 145 at 1–2.

Plaintiffs rely on *Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.*, 575 F.2d 530 (5th Cir.1978) [20] to support their contention that "when construing the *res judicata* effect of a consent decree entered into as a result of the voluntary resolution of claims, the court should look to the intent of the parties to determine which claims were resolved as a result of the settlement and consent order." Doc. 144 at 5. However, *Kaspar* was decided in the unique context of considering the preclusive effect of a previous declaratory judgment action in a later patent infringement suit and is therefore distinguishable. Moreover, the Court does not completely agree with plaintiffs' reading of *Kaspar*. In *Kaspar*, the Fifth Circuit discussed claim preclusion and issue preclusion in the context of consent decrees. *Kaspar*, 575 F.2d at 537–40. The Fifth Circuit noted that consent decrees are normally "given the finality accorded under the rules of claim preclusion." *Id.* at 538. However, the

Fifth Circuit explained that different rules apply to issue preclusion (sometimes called collateral estoppel) because the purpose of a consent decree is typically to avoid the litigation of any issue. *See id.* at 539. The Fifth Circuit concluded, in the context of *issue* preclusion, that "when determining the effect to be given a decree entered by consent of the parties, consideration is to be given to their intention with respect to the finality to be accorded the decree as reflected by the record and the words of their agreement." *Id.* at 540. Contrary to plaintiffs' contention, the Fifth Circuit did not hold that the Court must consider the parties' intent for purposes of *claim* preclusion (*res judicata*). *See Citibank v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1504 (11th Cir.1990)(citing *Kaspar*, distinguishing between the preclusive effect of a consent judgment "depending upon whether *res judicata* (claim preclusion) or collateral estoppel (issue preclusion) is involved").

However, the Court does not agree with Chevron that intent is never relevant. Courts have recognized that, because consent judgments are contractual, the parties may alter the preclusive effects of a judgment by the terms of the consent decree. *See* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4443 at 262 (1981); *Young–Henderson v. Spartanburg Area Mental Health Center*, 945 F.2d 770, 774–75 (4th Cir.1991); *May v. Parker–Abbott Transfer and Storage, Inc.*, 899 F.2d 1007, 1010 (10th Cir.1990). Plaintiffs cite several cases in which courts have limited the claim preclusion effect of a

---

**19.** Consent judgments are entered upon settlement by the parties and assume forms that range from simple orders of dismissal with or without prejudice to detailed decrees. *See* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4443 at 255–56 (1981). Regardless of form, consent judgments share the common characteristic that

the court has not actually resolved the substance of the issues presented. *See id.*

**20.** *Kaspar* is binding on this court pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981)(en banc), in which the Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

judgment based on an express manifestation of such an intent in the consent judgment. *See e.g., Young–Henderson,* 945 F.2d at 775 (finding that language of Consent Order which provided "[i]t is further agreed that this Order of Dismissal only terminates the claims raised in the complaint in the above-entitled action and does not in any way affect any other charges or claims filed by the Plaintiff subsequent to the commencement of this within [sic] action," limited claim preclusion to those claims actually raised in the complaint in the first action); *Cf., May,* 899 F.2d at 1010–11 (refusing to alter preclusive effects of consent judgment where parties did not expressly reserve the right for subsequent litigation).

■ Here, SJRTC did not expressly reserve the right to bring a later lawsuit arising out of Gulf's lease of the Site. Indeed, the Release, stipulation of dismissal and Order dismissing the case with prejudice in the first action are silent as to the settlement's intended claim preclusion effects. Nevertheless, plaintiffs argue that the language of the Release and the facts surrounding its execution demonstrate that the parties only intended to release claims related to "oil" contamination on the Site and not non-oil contamination on the Site and in the salt marsh. *See* Doc. 137 at 7. Plaintiffs have cited no case (and the Court has found none) in which a court inferred such a reservation of right absent a clear expression of this intention by the parties.[21] If SJRTC negotiated a right to bring a later lawsuit arising out of Gulf's

lease of the property, it should have made sure that the Release clearly stated it. The Court is "not willing to supply by inference what the parties have failed to expressly provide," especially in light of the strong policy in favor of claim preclusion. *May,* 899 F.2d at 1011. Accordingly, the Court will apply the traditional four-part claim preclusion analysis outlined above.

There is no dispute as to the first three elements. The Court in the first action had proper jurisdiction based on diversity of citizenship. *See* Pretrial Stipulation at ¶ 1. Second, there was a final judgment on the merits in the first action. The parties reached a settlement agreement, executed a stipulation of dismissal with prejudice and this Court entered an Order dismissing the case with prejudice. *See Ragsdale v. Rubbermaid, Inc.,* 193 F.3d 1235, 1238 (11th Cir.1999); *Citibank,* 904 F.2d at 1501–02.[22] Third, NSC and GS & F (plaintiffs in this action) are in privity with SJRTC (plaintiff in the first action) and Chevron (defendant in this action) is in privity with Gulf (defendant in the first action).

■ However, the parties do dispute the final element—i.e., whether the claims in the first action and the claims in the present litigation are the same "cause of action." In the Eleventh Circuit, "the principal test for determining whether the causes of action are the same is whether the primary right and duty are the same in each case. In determining whether the

---

**21.** Likewise, the Court is unpersuaded by plaintiffs' related argument that, by agreeing to a narrower Release than originally proposed, Gulf essentially agreed to split the claims, thereby waiving any preclusive effect beyond the express terms of the Release. This case is distinguishable from those cited by plaintiffs in support of this contention because Gulf did not expressly consent to split the claim into two suits. *See Simmons v.*

*New. Pub. Sch. Dist. No. 8,* 251 F.3d 1210, 1214 (8th Cir.2001); *Young–Henderson,* 945 F.2d at 775 (4th Cir.1991); *6000 S. Corp. v. Kelly Energy Sys., Inc.,* 1996 WL 590606 at *3 (N.D.Cal. Sept.24, 1996).

**22.** At the hearing, plaintiffs agreed that there was a final judgment on the merits in the first action. Tr. 40–41.

causes of action are the same, a court must compare the substance of the actions, not their form." *Ragsdale,* 193 F.3d at 1239 (quoting *Citibank,* 904 F.2d at 1503). It is generally said, "that if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, that the two cases are really the same 'claim' or 'cause of action' for purposes of *res judicata." Id.* "Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes." *Id.* (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) cmt. b (1980)). Thus, the Court must "look to the factual issues to be resolved [in the first action] and compare them with the issues explored in" this current litigation. *Id.* In so doing, the Court asks whether "the plaintiff could, or rather should, have brought the second claim with the first lawsuit." *Trustmark Insur. Co. v. ESLU, Inc.,* 299 F.3d 1265, 1270 (11th Cir.2002). For claim preclusion purposes, "claims that 'could have been brought' are claims in existence at the time the original complaint is filed." *Pleming,* 142 F.3d at 1357 (quoting *Manning v. City of Auburn,* 953 F.2d 1355 (11th Cir.1992)).

The similarities between the two lawsuits are clear. Both cases rely on the same historical nucleus of operative facts—i.e. Gulf's activities on the Site from 1906 until 1961 while operating a petroleum storage and distribution facility. In the first action, SJRTC alleged that Gulf spilled "oil and other petroleum products" on the Site which damaged the Site and ultimately seeped into Long Branch Creek. *See* C. at ¶¶ 5–8. SJRTC sought damages for Gulf's refusal to hold harmless SJRTC

from the consequences of Gulf's actions on the Site. *See id.* at ¶ 10. SJRTC also sought damages for Gulf's failure to return the leased premises in the same condition as they were prior to Gulf's lease of the Site. *See id.* at ¶¶ 11–14.

█ In this action, plaintiffs allege that while Gulf was operating the same petroleum storage and distribution facility on the Site from 1906–1961, Gulf contaminated the Site and adjacent salt marsh with "pollutants and contaminants, including but not limited to, petroleum products; black sludge-like materials; black solids; black liquids; tank bottoms;[23] drums; paint and painting related substances; yellow, grease-like substances; abrasive blast material; metal; hazardous substances; wastes; contaminants; and debris; as well as with oil." Doc. 57 at ¶ 1. Plaintiffs *inter alia* seek recovery of all costs associated with the cleanup of contamination on the Site and salt marsh and costs incurred in restoring the Site and salt marsh, including the subsurface, to as good a condition as it was prior to the contamination by Gulf. *See id.* at 26–29.

Plaintiffs contend that the first action and the current action are different in two primary ways. Plaintiffs argue that the first action was about contamination by "oil" and this action is about contamination by things "other than oil." However, in the first action, SJRTC alleged that Gulf spilled "oil and *other petroleum products* " on the Site. Moreover, SJRTC sought recovery for Gulf's failure to return the leased premises in as good a condition as it was prior to Gulf's lease of the Site. This is certainly broad enough to encompass other types of contamination.

**23.** Tank bottoms are the waste products cleaned from the bottom of petroleum storage tanks.

Plaintiffs also argue that the current action is different because it focuses primarily (though not exclusively) on the salt marsh rather than the Site. Plaintiffs argue that the salt marsh (which is contiguous to the Site, between the Site and Long Branch Creek) is geographically distinct from the Site and is actually owned by the State of Florida. *See* Doc. 144 at 3–4. Plaintiffs point to the original lease agreements which plaintiffs contend show that the salt marsh was excluded from the leased premises. *See id.* Plaintiffs also contend that aerial photography shows a fence line between the salt marsh and the rest of the Site. *See id.* While there is strong contrary evidence that the salt marsh indeed was part of the leased premises and that the parties in the first action assumed that any contamination of the salt marsh at the low water mark (as well as in Long Branch Creek) was part of the first action, the Court need not resolve this issue directly, for plaintiffs' argument is belied by their primary theory as to how Gulf contaminated the salt marsh. Plaintiffs contend that Gulf (Chevron's predecessor) disposed of petroleum wastes in the disposal pit at OW–8 (located on the Site) and that some of these waste products were then pumped into the salt marsh. *See* Plaintiffs' Joint Exhibit 13 (Chrostowski Expert Report) at 4; Plaintiffs' Joint Exhibit 12 (Sadat Expert Report) at 12. Thus, while the petroleum waste products may have ended up in the salt marsh, plaintiffs' suit is clearly focused on the source of that contamination— Gulf's contamination activities from 1906 to 1961 on the Site, the same contamination activities which were or should have been part of the first action.[24] Indeed, at the

hearing, plaintiffs' counsel explained that Gulf is responsible for the contamination in the salt marsh because, "[i]t's not the property where the contamination is. It's the property where the contamination originated." Tr. 56. This is consistent with SJRTC's theory in the first action: that Gulf's activities on the Site led to contamination of Long Branch Creek.

Thus, the first action and this action share common elements of "time, space, origin, [and] motivation" and would unquestionably "form a convenient unit for trial purposes," with "substantial overlap" in witnesses and other evidence between the two actions. *Ragsdale*, 193 F.3d at 1239 (quoting Restatement (Second) of Judgments § 24(2), cmt. b (1980)). Plaintiffs' attempts to say that this suit is not about the Site, but about the salt marsh, and not about oil contamination, but about other types of waste, are artificial distinctions which cannot be utilized to avoid the preclusive effect of the first action.

Plaintiffs argue that they could not have raised these new claims in the first action because they are based on recently discovered contamination on the Site and in the salt marsh. While traditional principles of preclusion allow additional litigation if some new wrong occurs after the first action is filed, *see Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1326 (7th Cir.1992); *Pleming*, 142 F.3d at 1357, plaintiffs have not alleged any such new wrongful conduct. Gulf vacated the Site in 1961 or 1962; thus, any wrongful conduct by Gulf on the Site occurred well before the first action was filed in 1978.[25] That plaintiffs now better understand the extent of the con-

---

24. Likewise, plaintiffs' other theory that the pipeline which connected the Shell and Gulf facilities across Long Branch Creek leaked in the salt marsh is based on Gulf's (and Shell's) alleged activities on the Site.

25. As such, this case is distinguishable from *Pleming* and related cases, in which the courts permitted a second action to go forward where new wrongs occurred during the pendency of the first action.

tamination arising from Gulf's actions on the Site does not allow plaintiffs to avoid the *res judicata* effect of the first action. *See United States v. Gurley*, 43 F.3d 1188, 1196 (8th Cir.1995) (noting that a " 'claim' should be determined not by the actions of a plaintiff vindicating its rights but by the conduct or alleged conduct of a defendant breaching those rights"); *Supporters to Oppose Pollution*, 973 F.2d at 1326 (noting that "new evidence of injury differs from a new wrong"). Thus, for claim preclusion purposes, plaintiffs' current claims "could have been brought" in the first action because they were in existence at the time the original complaint was filed.[26]

Moreover, this is not a case in which SJRTC had no means of knowing the extent of the contamination. There was evidence in the first action that Gulf disposed of its petroleum waste products in pits on the Site. *See* Chevron Exhibit # RO2415–RO2486 (Claudius Jefferson Hansard Deposition, December 18, 1979); Chevron Exhibit # RO1263–RO1331 (Charlie Edward Arnold Deposition, April 28, 1980) at 21–24, 40–43, 45–56; Chevron Exhibit # RO2014–RP2130 (Henry Blanchard Wyche, Jr. Deposition) at 44–46. There was also evidence that underground pipelines from the former Gulf Oil terminal were present at the Site and extended into Long Branch Creek. *See* Chevron Exhibit # RO1140–RO1214 (Lake Ray, Jr. Deposition, July 25, 1980) at 25–28; Chevron Exhibit # RO2014–RP2130 (Henry

Blanchard Wyche, Jr. Deposition) at 47–48. There was also testimony about the existence of the Florida Emergency Pipeline running underneath Long Branch Creek. *See* Chevron Exhibit # R00159–R00204 (Claude Belcher Deposition) at 26. In this action, plaintiffs' own expert, Wayne Grip, has identified burial pits located near the salt marsh in aerial photographs dating from 1942. *See* Plaintiffs' Joint Exhibit 10 (Grip Expert Report) at 4. Grip has also identified a ditch or buried pipe trench located directly to the south of the salt marsh and lined up with the pipeline to the salt marsh in a photograph dating from 1949. *See id.* at 13. Accordingly, this is more akin to a "situation in which the plaintiff failed to investigate its claims in a timely manner in order to present them in the first litigation." *Trustmark Insur. Co.*, 299 F.3d at 1272.

Plaintiffs argue that their claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") cannot be barred on claim preclusion grounds because CERCLA was not in existence at the time the first action was filed.[27] While this argument has some initial appeal, the "[m]ere adoption of new statutory provisions does not defeat claim preclusion ... if a single closed transaction is involved". *See* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 4411 at 265–66 (1981). This is consistent with Eleventh Circuit cases

---

**26.** Plaintiffs argue that they could not have brought this action until 1999 because they had not incurred any recoverable costs associated with the salt marsh. *See* Doc. 137 at 15. Plaintiffs cite cases for the proposition that a cost recovery action cannot be brought under CERCLA until recoverable costs are incurred. *See e.g., United States v. Union Scrap Iron & Metal*, 123 B.R. 831 (D.Minn.1990); *United States v. Outboard Marine Corp.*, 104 F.R.D. 405 (N.D.Ill.1984). However, as plaintiffs have pointed out, CERCLA did not exist when the first action was filed.

**27.** Counts Eight and Nine of the Second Amended Complaint are brought under CERCLA. In Count Eight, plaintiffs seek all past, present, and future "response costs" and "removal costs" incurred by the plaintiffs at the Site and in the salt marsh pursuant to CERCLA § 107(a). In Count Nine, plaintiffs seek contribution for response costs incurred by plaintiffs at the site and salt marsh pursuant to CERCLA § 113(f).

holding that the claim preclusion analysis turns on the facts of the case, rather than the remedy sought. *See e.g., Piper,* 244 F.3d at 1295 (claim preclusion "turns primarily on the commonality of the facts of the prior and subsequent actions, not on the nature of the remedies sought"); *Pleming,* 142 F.3d at 1356–57 (claim preclusion acts as a bar, " 'not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact' ") (quoting *NAACP v. Hunt,* 891 F.2d 1555, 1561 (11th Cir. 1990)).[28]

Neither is CERCLA a "new right" as contemplated by *Pleming v. Universal–Rundle Corp.,* 142 F.3d 1354 (11th Cir. 1998).[29] In *Pleming,* the plaintiff filed an employment discrimination action against her employer. *See Pleming,* 142 F.3d at 1357. During the course of the litigation, other instances of alleged discrimination occurred. *See id.* Rather than amending her complaint to include these new claims, plaintiff filed a second lawsuit. *See id.* The Eleventh Circuit noted that claim preclusion did not bar the second lawsuit because plaintiff had exercised her option, pursuant to Rule 15(d), Fed.R.Civ.P., not to supplement the pleadings with an after-acquired claim. *See id.* The Court explained that "the parties frame the scope of litigation at the time the complaint is filed and that a judgment is only conclusive regarding the matters that the parties might have litigated at that time but not regarding 'new rights acquired, pending the action which might have been, but which were not required to be litigated.' " *Id.* (quoting *Manning v. City of Auburn,* 953 F.2d 1355, 1360 (11th Cir.1992)). The *Pleming* Court was referring to new factual claims based on new post-suit wrongful conduct—not claims based on the same factual bases but new or different legal theories.

---

**28.** In *Morningside–Lenox Park Ass'n v. Volpe,* 334 F.Supp. 132 (N.D.Ga.1971), the court held that plaintiff was not barred by *res judicata* from litigating its claim with regard to the National Environmental Policy Act of 1969 because the law did not exist at the time of the first action. *See Morningside–Lenox,* 334 F.Supp. at 138. The court engaged in no analysis and cited no authority for its position. Moreover, the case has never been cited by another court for this proposition. Accordingly, this Court will not rely on the holding in *Morningside–Lenox.*

**29.** Plaintiffs cite several other cases to support their contention that CERCLA created "new rights." *See e.g., In re Duplan Corp.,* 212 F.3d 144, 153 (2d Cir.2000); *Matter of Penn Central Transp. Co.,* 944 F.2d 164, 168 (3d Cir.1991); *Kelley ex rel State of Michigan v. John A. Biewer Co. Of Schoolcraft, Inc.,* 1993 WL 186557 (W.D.Mich. May 21, 1993); *Morningside–Lenox Park Ass'n v. Volpe,* 334 F.Supp. 132 (N.D.Ga.1971). However, none of these cases supports plaintiffs' position that claim preclusion does not bar plaintiffs' CERCLA claims. The courts in *Duplan* and

*Penn Central* considered CERCLA claims in the bankruptcy context. In *Duplan,* the Court held that the CERCLA claims were post-petition claims for purposes of bankruptcy because CERCLA was enacted after the bankruptcy petitions were filed. *See In re Duplan Corp.,* 212 F.3d at 153. In *Penn Central,* the Court held that because CERCLA had not yet been enacted, the petitioners lacked a CERCLA cause of action against the debtor prior to the Consummation date. *See Matter of Penn Central Transp. Co.,* 944 F.2d at 168. In *Kelley,* the court applied a Michigan state court rule which limits *res judicata* to claims actually raised in the litigation unless there is an objection to the failure to join the claims. *See Kelley,* 1993 WL 186557 at *4. Since no CERCLA claim was included in the first action and there was no objection by defendants, the Court held that plaintiffs' CERCLA claims were not barred by *res judicata. See id.* The Court also noted that "CERCLA was not even enacted when the suit was first filed; thus, it cannot be said that the claim 'could have been filed' in any court at the time the lawsuit was initiated." *Id.* For a discussion of *Morningside–Lenox* see note 28 *supra.*

Plaintiffs finally argue that claim preclusion should not apply because Gulf fraudulently concealed the scope of the contamination in the first action. In support of this argument, plaintiffs rely solely on SJRTC's first set of interrogatories in the first action in which SJRTC requested Gulf to state "whether any occurrence of oil product spillage, discharge or loss or outright dumping was recorded or is known to have happened at the facility from 1907 through 1961; and describe the dates and circumstances and results in terms of amounts of products lost and repairs and restorations made, if any, for each such occurrence." Plaintiffs' Joint Exhibit 30. In response to the interrogatory, Gulf wrote, "[n]o such information is available." *Id.* Plaintiffs contend that SJRTC relied on this "false" statement when it decided to settle the case.

The Restatement (Second) of Judgments recognizes several limited exceptions to claim preclusion, one of which is a party's failure to pursue a claim in a former action as a result of the other party's "fraud, concealment, or misrepresentation." *See* RESTATEMENT (SECOND) OF JUDGMENTS § 26, comment j (1982). However, as a matter of law, plaintiffs have adduced insufficient evidence that the interrogatory response, made by Gulf many years after it had ceased operations on the Site, was false at the time it was made. If anything, the inconclusive nature of the interrogatory response should have prompted plaintiffs' predecessor in the first action to follow up to determine if further investigation of other possible contamination was warranted. Moreover, even assuming that Gulf's response to the interrogatory was false or

misleading, it cannot be said that it prevented SJRTC from including these new claims in the first action. As discussed *supra,* SJRTC had sufficient information in the first action (or could have obtained it with reasonable investigation) to pursue the claims now raised in this action.[30]

Accordingly, plaintiffs' current action against Chevron is barred by *res judicata.* Based on this conclusion, the Court need not address the other issues raised by Chevron's Motion for Summary Judgment.

## V. Shell's Motion for Summary Judgment and Motion in Limine

Shell has filed a Motion for Summary Judgment (Doc. 116) and a related Motion in Limine to Exclude the Opinion Testimony of Mr. Wayne Grip, Dr. Paul Chrostowski and Dr. Marwan Sadat (Doc. 114).

As acknowledged by all, Shell's situation is markedly different than Chevron's. While the salt marsh (which is the primary concern in this suit) is directly contiguous to the premises leased by Gulf (Chevron's predecessor) from 1906 to 1961, Shell's petroleum operations were on a different site separated from the salt marsh by Long Branch Creek. Thus, it is much less obvious how Shell could be responsible for contamination of the salt marsh and Site. Moreover, plaintiffs concede a lack of direct evidence of Shell's role in the contamination and, owing in part to the passage of time, there is a dearth of even circumstantial documentary or testimonial evidence of Shell's involvement. Understandably, plaintiffs seek to fill this evidentiary gap with expert testimony to provide the nec-

---

**30.** To the extent plaintiffs are challenging the validity of the judgment in the first action, that challenge should have been brought in the first action (or at least directly as a challenge to the first action) and not indirectly in the second filed action. *See Russell v. Sun-America Securities, Inc.,* 962 F.2d 1169, 1176

(5th Cir.1992)(citing 18 C. Wright, A. Miller & E. Cooper § 4415 at 129; Restatement (Second) of Judgments § 78–82 (1981)). However, plaintiffs have never, in the 19 plus years since the first action was concluded, sought to invalidate the judgment in the first action based upon fraud.

essary causal link between Shell's activities and the contamination which is the subject of this suit.

Shell argues that summary judgment should be granted on each count of the Second Amended Complaint brought against Shell because plaintiffs cannot establish causation between Shell's actions and the contamination of the Site and salt marsh. Plaintiffs acknowledge that without the proposed expert testimony of Mr. Wayne Grip, Dr. Paul Chrostowski and Dr. Marwan Sadat, there is insufficient evidence establishing causation. *See* Doc. 135. However, Shell argues in its motion in limine that the expert testimony is inadmissible. Accordingly, because of the acknowledged importance of the expert testimony to plaintiffs' case against Shell, the Court will now consider Shell's motion in limine to exclude plaintiffs' experts. *See Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329 (11th Cir.2003)(affirming trial court that first considered motion in limine to exclude expert testimony and then motion for summary judgment).

In its motion in limine (Doc. 114) and supporting memorandum (Doc. 115), Shell argues that the testimony of plaintiffs' experts should be excluded under Rules 702 and 403 of the Federal Rules of Evidence. Under the Supreme Court's decision in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), trial courts are required to act as "gatekeepers" to prevent speculative, unreliable expert testimony from reaching a jury. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir.2002). This responsibility is identical when the court is presented with a proffer of expert technical evidence. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). However, " '[t]he gatekeeper role ... is not intended to supplant the adversary system or the role of the jury.' " *United States v.*

*Frazier*, 322 F.3d 1262, 1268 (11th Cir. 2003) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir.1999)).

 The party tendering the expert has the burden of proving admissibility of the testimony by a preponderance of the evidence. *See Allison* 184 F.3d at 1306. The party offering the expert must show that: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Hudgens*, 328 F.3d at 1338 (quoting *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

The *Daubert* Court listed four non-exhaustive factors a court may consider in determining whether expert testimony is reliable: "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Allison*, 184 F.3d at 1312 (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97). In *Kumho Tire*, the Supreme Court stressed that "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167. In some cases, the factors may be pertinent, while in other cases "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 150, 119 S.Ct. 1167.

 "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence

that is connected to existing data only by the *ipse dixit* of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997). Expert testimony should generally be excluded if it is purely speculative or conjectural. *See e.g., McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800–01 (6th Cir.2000) ("an expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known.... An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.") (quotations omitted); *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1072–73 (6th Cir.1999)(affirming trial court's decision in a CERCLA case to strike proposed expert's affidavit as based on "speculation, conjecture, and possibility" and affirming trial court's holding that the "inadequate factual basis" made the proposed expert's affidavit "scientifically unreliable"); *Cf. Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) ("Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison,' other contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony'") (internal citations and quotations omitted). "A district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996). The Court will now apply these principles to the proffered testimony of plaintiffs' experts.

As an initial matter, at the hearing on Shell's motion for summary judgment and motion in limine, plaintiffs' counsel suggested that the Court could convene an evidentiary hearing under *Daubert* if it had concerns about plaintiffs' experts. Tr. 129–30. However, the Court held a non-evidentiary *Daubert* hearing and has reviewed the experts' reports, depositions and verifications and finds that an additional *Daubert* hearing would not further assist the Court. *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir.2001)(*Daubert* hearings are discretionary).

### (1) Mr. Wayne Grip

Grip and his company Aero–Data were retained by plaintiffs to perform an "historical aerial photography study" of the Site. *See* Plaintiffs' Joint Exhibit 12 at 1. Grip is an expert in photo interpretation and photogrammetry.[31] *See id.* Grip's expert report has been filed as Plaintiffs' Joint Exhibit 10 (hereinafter "Grip Report") and the transcript of his deposition testimony has been filed as Plaintiffs' Joint Exhibit 11 (hereinafter "Grip Depo.").

Grip reviewed twenty-six historical photographs of the Site dated from December 14, 1942 until January 7, 1999. *See* Grip Report. Based on these photographs, Grip opines that a pipeline was installed in the marsh between the Shell and Chevron facilities at some time between June 23, 1943 and September 14, 1943 and there was no visual evidence that it had been removed. *See id.* at 13. Grip further opines that it was probable that rusting or breaks in the pipeline occurred at some

---

**31.** Photogrammetry is the science of mapping using aerial photography. Plaintiffs' Joint

Exhibit 11 (Grip Depo.) at 14.

time in the past, which would have released contaminants from the pipeline into the marsh. *See id.*[32]

Shell does not challenge Grip's qualifications to explain and interpret aerial photography. Rather, Shell argues that Grip is not qualified to testify as to the "probable" corrosion of the pipeline. *See* Doc. 115 at 10. Shell further argues that even if Grip is qualified to offer an opinion on the condition of the pipeline, his opinion on the pipeline releasing a contaminant should be excluded because it is not reliable. *See id.* at 11–12. In response, plaintiffs argue that Grip's opinion is based on his experience as an expert having done many studies of pipelines in a marsh. *See* Doc. 136 at 10. Plaintiffs also contend that Grip's opinion is reliable because it is "borne out by the facts." *Id.*

 Plaintiffs have failed to show that Grip's experience provided a reliable basis for his opinion regarding the corrosion of the pipeline and release of contaminants. Grip's only stated expertise is photo interpretation and photogrammetry. While it is conceivable that photographs could reveal the condition of a pipeline and release of contaminants, Grip testified that he could not see the pipeline, any corrosion of the pipeline or any evidence of a release from the pipeline in the photographs. *See* Grip Depo. at 79–80. That the pipeline is in fact broken does not make Grip more qualified (by simply looking at the historical photographs) to render an opinion on

the condition of the pipeline or its release of contaminants. Moreover, at the hearing, counsel for plaintiffs represented that Grip's testimony with respect to Shell would be limited to what Grip could actually see in the photographs—i.e., the location of the pipeline, when the pipeline first appeared and the presence of oil sheens in Long Branch Creek. Tr. 123. For these reasons, Grip's testimony about the condition of the pipeline and its release of contaminants will be excluded.

**(2) Doctor Marwan M. Sadat**

Doctor Marwan M. Sadat ("Sadat") was retained by plaintiffs to provide an expert opinion regarding the waste disposal practices at petroleum bulk storage facilities during the time period 1900–1960 and to evaluate the waste disposal practices at the Site. *See* Plaintiffs' Joint Exhibit 12 at 1. Sadat is founder and president of SAI, a civil and environmental engineering consulting firm. *See id.* Sadat has a doctoral degree in civil and environmental engineering and a masters degree in engineering science. *See id.* Sadat's expert report has been filed as Plaintiffs' Joint Exhibit 12 (hereinafter "Sadat Report"), his deposition testimony has been filed as Plaintiffs' Joint Exhibit 4 (Sadat Depo.) and his subsequent expert verification (hereinafter "Sadat Verification") has been filed as Exhibit 5 to Doc. 144.

Sadat opines that there are four pathways by which Shell contributed to the contamination in the Salt Marsh. *See* Sadat Verification.[33] With respect to all four

---

32. Grip proffered several other opinions which are not at issue in this motion because they pertain to Gulf's operations on the Site. Grip opines that based on the April 4, 1949 photograph, there appeared to be a pipe trench located directly to the south and lined up with the pipeline to the marsh and that it appeared to be associated with one or more of the large vertical storage tanks at the site. *See id.* Grip also opines that there had been previous spills and leaks from the petroleum storage tanks because there was dark staining

on the surface within the storage tank levee systems. *See id.* Grip further opines that based on his experience and training and the topography of the Site, it was "more likely than not" that there had been releases from the Gulf tanks (including tank bottoms) into the lower marsh. *See id.*

33. In an expert report dominated by Sadat's analysis of Gulf's responsibility for the contamination, Sadat devotes only one conclusory page of text to Shell's responsibility. Sa-

pathways, Shell argues that Sadat's opinions should be stricken as scientifically unreliable because they are not based upon sufficient facts or data and they are not the product of reliable principles or methods. *See* Doc. 115 at 12–15. Shell does not challenge Sadat's qualifications to render these opinions. In response, plaintiffs argue that Sadat's opinions are admissible because they are "well-grounded" in Sadat's experience and on the facts in the record. Doc. 136 at 10–14.

First, Sadat opines that from 1946–48, while Shell was transporting petroleum products from the Gulf facility to its facility via the pipelines (both on the Site and running under Long Branch Creek),[34] waste products were cleaned from the pipelines and placed in the disposal pit at OW–8 (hereinafter "Pathway One"). *See* Sadat Verification at ¶¶ 20–22. In reaching this conclusion, Sadat opines that based on his experiences pipelines used at petroleum terminals require "periodic cleaning" and that the cleaning usually involves the passing of a fabric plug (known as a "pig") through the pipelines to collect the petroleum residue. *Id.* at ¶ 21. Based on testimony that the pipelines were kept full, Sadat opines that these pipelines would have accumulated significant wastes in the course of six months or a year. *See id.* at ¶ 17. Sadat further opines that the pipelines would have been cleaned from the Gulf side because it was not possible to clean the pipelines from the Shell end. *See id.* at ¶¶ 18, 21. He based this opinion on testimony that it was almost impossible to blow the pipelines clean from the Shell side because the pipelines were laid so low in the creek. *See id.* at ¶ 18. Sadat opines that cleaning a six to eight inch pipeline of about 2000 feet in length would

remove approximately thirteen to fifteen 55–gallon drums of waste material. *See id.* at ¶ 22. Sadat then opines that during the 1940's the most logical location for the disposal of these wastes would have been in the disposal pit (OW–8) on Gulf's property. *See id.* at ¶ 21.

■ In efforts to causally link Shell to the disposal pit at OW–8, Sadat has constructed a theory that relies on several premises all of which must be reliable for Sadat's opinion as to Pathway One to be admissible. *See Dodge v. Cotter Corp.,* 328 F.3d 1212, 1222 (10th Cir.2003)(noting that under *Daubert,* " 'any step that renders the analysis unreliable ... renders the expert's testimony inadmissible' "); *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002)("To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step.") The first premise is that the pipelines would have been cleaned during the time Shell used them. The second premise is that the pipelines would have been cleaned from the Gulf side. The final premise is that the waste products cleaned from the pipelines would have been placed in Gulf's disposal pit at OW–8. Because Sadat's second and third premises are unreliable, Sadat's opinion about Pathway One is due to be stricken.

In concluding that the pipelines would have been cleaned from the Gulf side, Sadat relies solely on testimony that it was a "practical impossibility" to blow the pipelines free of product or pump any appreciable quantity of products from the Shell side of the pipelines because of the way they were laid in the creek bed (*see* Knapper depo. at 144–45, 152; Plaintiffs' Joint Exhibit 7). Sadat did not conduct any

---

dat's subsequent Verification explains Shell's role in greater detail.

**34.** The Court will collectively refer to the pipeline running under Long Branch Creek and the pipelines on the Site as the "pipelines."

**1272**

independent verification of this testimony. He did not visit the Site or Shell's property. *See* Sadat Depo. at 43–44, 50. Sadat did not conduct any tests to determine whether the pipelines could have been cleaned from the Shell side. *See id.* While explaining that pipelines are generally cleaned with a fabric plug (known as a "pig"), Sadat did not discuss Shell's cleaning practices in the 1940's nor did he discuss whether an alternative cleaning method could have been employed from the Shell side.[35] It is hard to conceive that Sadat applied any "scientific, technical, or specialized expertise" in reaching his conclusion that the pipelines would have been cleaned from the Gulf side.

In concluding that any waste products removed from the pipelines would have been placed in the disposal pit at OW–8,[36] Sadat implicitly concludes that waste products from the pipelines would have been disposed of on the Gulf side. However, Sadat's conclusion is not based on any facts in the record. Moreover, Sadat has not based this conclusion on his experience. This is underscored by Sadat's own testimony that the disposal pit on the Gulf side "would be the logical place to take [the waste products]. To recover product, and because [Gulf] had a pit that was operating as a waste disposal facility, why would you take it anywhere else?" Sadat Depo. at 86.

Sadat's theory as to Pathway One is based upon the assumptions that the pipelines would have been cleaned from the Gulf side and that any waste products from the pipelines would have been disposed of on the Gulf side. These assumptions, however, are based solely on speculation and possibility. As such, Sadat's opinion as to Pathway One is inadmissible.

■ Second, Sadat opines that it was "highly likely" that product was released into the salt marsh during the 1940's when Shell used the pipelines (hereinafter "Pathway Two"). Sadat Report at ¶ 23. Though there is no actual evidence of a leak, Sadat opines that corrosion of steel is a progressive activity, "so the corrosion of the pipeline [running under Long Branch Creek] undoubtedly began well earlier than 1957." *Id.* However, Sadat testified that he "would need a lot more data to be able to give you . . . a good assessment" as to when the pipeline corroded. Sadat Depo. at 102. Indeed, Sadat has never inspected the pipeline, has no evidence about the pipeline's thickness or about whether maintenance was performed on the pipeline. *See* Sadat Depo. at 108–10.[37] As such, Sadat's opinion as to Pathway Two is based on speculation.

■ Likewise, Sadat's related theory that waste products were released from the pipeline running under Long Branch

---

**35.** At his deposition, Sadat conceded that Shell introduced a chemical cleaning agent in the 1930's that eliminated the need for "pigging." Sadat Depo. at 93.

**36.** Sadat opines that based on his review of available testimony, the report by Grip and the description of the excavation of OW–8 by Metroplex, the disposal pit at OW–8 "was designed and utilized by Gulf to dispose of waste petroleum products such as tank bottoms and pipeline cleanings." Sadat Report at 12. Sadat opines that, "[b]ased on the circular concrete construction of the pit, with the accompanying sump and pipes for draw-

ing off liquid, that Gulf most probably used the pit as a crude oil-water separator in order to recover petroleum for re-refining; however the investigation data indicates the presence of large quantities of waste petroleum products that were either discharged directly from the pit into the marsh or seeped from the disposal pit into the marsh." *Id.*

**37.** In deposition, Sadat testified that the only evidence supporting a pipeline leak was that when the pipeline was excavated there was a strong smell of hydrocarbons. *See* Sadat Depo. at 95.

Creek after Shell ceased using it (hereinafter "Pathway Three") is due to be stricken because it is speculative. *See* Sadat Verification at ¶ 24. Sadat opines that cleaning can never remove all waste products from a pipeline so petroleum products were "undoubtedly" still present in the pipeline when its use ceased. *Id.* Sadat then opines that the deterioration of the pipeline would have led to the discharge of petroleum waste products into Long Branch Creek and the salt marsh. *See id.* Sadat has not identified any objective source supporting his "experience" that cleaning can never remove all wastes from a pipeline. Indeed, at deposition, Sadat testified that while there is a "pretty good likelihood" that petroleum products remained in the pipeline, he conceded that if Shell had evacuated the pipeline this would have cleaned out all of the petroleum products. *See* Sadat Depo. at 105. Moreover, even assuming Sadat has identified a viable theory (i.e. cleaning can never remove all wastes from a pipeline) he has failed to reliably apply the theory to the facts of this case.[38] As noted *supra*, Sadat has never even inspected the pipeline.

▮ Finally, Sadat opines that the seepage of waste petroleum products, combined with discharges from the rusted pipeline, created a floating layer of waste petroleum products on the surface of the Creek (hereinafter "Pathway Four"). *See* Sadat Verification at ¶¶ 25–28. Sadat further opines that while a portion of the floating waste would be transported out to the St. John's River and an additional portion would disappear through natural aeration and biodegradation, a portion would move to the shoreline, where it would remain as a deposit on the shoreline or attached to plants. *See id.* at ¶ 26. Sadat opines that at low tide, water in the Creek would move out of the salt marsh, leaving behind a layer of waste petroleum product on the exposed ground. *See id.* Sadat opines that waste products from the disposal pit would accelerate the buildup, resulting in layer upon layer of waste products and that over time, the "lighter ends" of the petroleum would volatilize, leaving behind a heavier, tar-like material currently found in the salt marsh. *Id.* He bases this opinion on the historical evidence of petroleum contamination at the Shell facility and his experiences with this phenomenon at other similar sites. *See id.* at ¶ 25. Sadat contends that this theory is supported by recent field work conducted by Environmental Services, Inc., (ESI) and aerial photographs showing the water levels in the salt marsh at low and high tides. *See id.* at ¶¶ 27–8.

---

38. Sadat's explanation of "Pathway Three" is limited to two sentences in his expert report:
 > While periodic cleaning of the pipelines presumably occurred, petroleum products were undoubtably still present within the two pipelines passing under the creek when their use ceased. The deterioration of these pipelines would have led to the discharge of petroleum waste products to the creek and marsh.

 Sadat Report at 13.
 Sadat slightly expanded upon this theory in his Verification:
 > The third pathway is that waste products were released into the Salt Marsh when the pipe's integrity was breached, even assuming it was not breached until after Shell ceased using it (as Shell claims). The reason for this is that there would have been material amounts of waste products in the pipeline at this time, even assuming it had been cleaned. Cleaning can never remove all of the waste products. Thus, while, as noted above, periodic cleaning of the pipelines most likely occurred, petroleum products were undoubtedly still present within the two pipelines passing under the creek when their use ceased. The deterioration of these pipelines would have led to the discharge of petroleum waste products to the creek and Salt Marsh which, over time, would have washed or migrated out of the pipelines.

 Sadat Verification at ¶ 24.

Sadat did not include "Pathway Four" in his expert report but did include it in his expert verification which was filed after the Court's hearing on Shell's motion in limine and motion for summary judgment. Shell has moved to strike the portions of Sadat's verification which discuss Sadat's opinion about "Pathway Four" arguing that plaintiffs' failed to disclose Sadat's opinion as required by Rule 26, Fed. R.Civ.P. *See* Doc. 146. Plaintiffs argue that although Sadat's opinion about "Pathway Four" was not included in his expert report, his opinion had been adequately disclosed because it was the subject of prior briefing and was addressed at Sadat's deposition. *See* Doc. 147.

Rule 26(a), Fed.R.Civ.P., requires a party to disclose the identity of its experts, a complete statement of all opinions to be expressed by its experts and the basis for those opinions. A party must supplement its expert disclosures under Rule 26(a) if the party learns "that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 26(e)(1), Fed.R.Civ.P. Pursuant to Rule 37(c)(1), "a party that without substantial justification fails to disclose information as required by Rule 26(a) or 26(e)(1) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."

The Court is not persuaded by plaintiffs' argument that Sadat's Pathway Four opinion was the subject of prior briefing and was addressed at his deposition. At deposition, Sadat testified that:

There is one thing I should mention that's not in the report, and that's because we got these, this material after we got the report out. That's Shell's expert report by Mr. Hall and the re-

port by Stout. We also got some photographs, recently photographs [sic], four photographs of the Shell and the Gulf facility, and just looking at these photographs I think we are going to want to supplement our report with some additional written material, because there appear to have been a lot of spills that were emanating from both facilities, a lot of sheen coming out from the shoreline. And I think we are going to want to deal with that issue.

Sadat Depo. at 40–41. Based on this statement, counsel for Shell asked Sadat how he anticipated the recent photographs would affect his previously stated opinions. *See id.* at 69. Sadat then testified:

Well, first of all I don't know what conclusions we're going to reach, because we haven't really looked into it. But I've asked, I've asked Ken Goldstein, who is assisting me, to start looking at navigation charts to determine currents and elevations and tides to see where you would expect to see areas of heavy depositions from releases from the facilities themselves.

In fact, if you look at these photographs, you would see that there is a sheen which hugs the shore that seems to be releases coming from the facilities themselves. So I think we have to look at all of that and try to figure out what happened.

*Id.* Sadat later testified that free product on the surface of the Creek would be deposited on the banks of the Creek. *Id.* at 113–115. Sadat explained:

Well, if [the salt marsh] was tidal—and this is something that I just started looking at, and as I said, we're going to look at it a little carefully—if it was subject to tides so that it was inundated during high tide, as the tide recedes it leaves behind one of the free product

that was carried during the high tide action.

*Id.* at 114.

Thus, Sadat's deposition testimony did nothing more than put Shell on notice that Sadat might supplement his report based on the sheens and tidal action. It did not provide Shell with any information as to the conclusions (if any) Sadat would ultimately reach. When Sadat did not file a supplemental report, Shell had every reason to believe that Sadat had determined that the sheens were not related to the contamination of the Site and salt marsh.[39]

Plaintiffs contend that Sadat's opinions as to Pathway Four were "brought to Shell's attention" by plaintiffs' response to Shell's motion in limine. Doc. 147 at 2. However, plaintiffs' response (which was filed the same day as plaintiffs' response to Shell's motion for summary judgment), provided Shell with no more information than Shell could have gleaned from Sadat's deposition testimony.[40]

Accordingly, Shell was unable to challenge Sadat's conclusions and the methodology used to reach these conclusions in its motion in limine and its motion for summary judgment. As such, plaintiffs' fail-

ure to disclose Sadat's opinion as to "Pathway Four" was not harmless. Because plaintiffs failed to comply with the requirements of Rule 26(e), the Court will not permit them to now rely on Sadat's opinion about "Pathway Four" to oppose Shell's motion for summary judgment. Thus, Shell's Motion to Strike Late–Filed Expert Disclosures is due to be granted.[41]

**(3) Doctor Paul Chrostowski**

Doctor Paul Chrostowski ("Chrostowski") is an expert on the fate and effects of toxic chemicals in the environment—i.e., how chemicals are transported in the environment and why they migrate from one environmental location to another. *See* Doc. 144, Exhibit 4. Chrostowski and his firm CPF have been involved with the Site since 1999.

In his initial report, Chrostowski focused entirely on Gulf's contamination of the Site and salt marsh. *See* Doc. 115, Exhibit E. However, once Shell was added as a party defendant, Chrostowski filed a supplementary report explaining why Shell was also now a "primary" source of the contamination. *See* Plaintiffs' Joint Exhibit 13 (hereinafter "Chrostowski Report"). Plaintiffs

**39.** Sadat's deposition was taken September 13, 2002. Thus, Sadat had ample time to file a supplemental report before the December 6, 2002 dispositive motion deadline. *See* Doc. 112. Plaintiffs did not file the subject expert verification containing the information about "Pathway Four" (Doc. 144) until February 4, 2003, *after* the Court's hearing on Shell's motion for summary judgment and motion in limine.

**40.** In their response to Shell's motion in limine, plaintiffs noted that Sadat had found "three pathways available for the Shell contamination to have reached the Salt Marsh." Doc. 136 at 12. Plaintiffs also wrote:

Finally, Dr. Sadat concluded that leaks would have occurred on a regular basis at both the Shell and Gulf facilities. Sadat Dep. at 61. This conclusion was confirmed

by Dr. Sadat who noted a sheen coming from the Shell and Gulf facilities in historical aerial photographs. Sadat Dep. at 40–41, 63–64. According to Dr. Sadat, such spills into Long Branch creek would have led to deposits into the Salt Marsh. Sadat Dep. at 115.

Dr. Sadat explained that some of the spill is "carried by tidal action and eventually deposited on the banks." Sadat Dep. at 114. He testified that in a tidal water, like Long Branch Creek, it would end up in the marsh. Sadat Dep. at 114.

Doc. 136 at 14.

**41.** Based on its resolution of the Motion to Strike Late–Filed Expert Disclosures, the Court will not address the merits of the Shell's Motion in Limine with respect to "Pathway Four."

subsequently filed a "Verification of Paul Chrostowski" (Doc. 144, Exhibit 4)(hereinafter "Chrostowski Verification").[42] Chrostowski's deposition is filed as Plaintiffs' Joint Exhibit 14.

Chrostowski says that the contamination in the salt marsh came from two sources—the pipeline running under Long Branch Creek and landfarming operations by Gulf and Shell.[43] Chrostowski further opines that "facilitated transport" played a significant role in the migration of these wastes to the salt marsh.[44]

Chrostowski opines that the pipeline played two different roles in contaminating the salt marsh. See Chrostowski Depo. at 57. First, he opines that the pipeline directly leaked into the salt marsh. Chrostowski bases this conclusion on the Shell memorandum, dated February 11, 1957, which states that the pipelines under the Creek "are now abandoned and completely rusted out", that the pipeline is in fact broken today, and that there was evidence of hydrocarbons around the broken pipeline when it was rediscovered. Chrostowski Verification at 8; Chrostowski Depo. at 13–14. Second, Chrostowski opines that the broken pipeline and its bed provided a conduit for preferential transport of contaminants from the Shell facility across Long Branch Creek to the salt marsh. Chrostowski Verification at ¶¶ 24–25. Chrostowski contends there is a "substantial amount of scientific literature" supporting his opinion on preferential transport. Id. at ¶ 25.

With respect to landfarming, Chrostowski says that contaminants on the Shell side would have been transported through the groundwater to Long Branch Creek (on the Shell side) and then would have migrated across Long Branch Creek to the salt marsh via the pipeline or the pipeline's bed. Chrostowski opines that gasoline spills would have further facilitated the migration of the contaminants across the creek to the salt marsh. See Chrostowski Verification at ¶ 22. Chrostowski bases his opinions on testimony that Shell landfarmed non-hazardous tank bottoms on its property north of the tank area. See Plaintiffs' Joint Exhibit 3 (Daniel Boz Deposition) at 48–9 & Exhibit 2 thereto (Contamination Assessment Report and Conceptual Remedial Action Plan prepared by Handex of Florida, Inc., October 31, 1989) at 2–3.[45] He also relies on an environmental report identifying a "heavy black substance" in a recovery well adjacent to the bank of the salt marsh on the Shell side. See Plaintiffs' Joint Exhibit 3 (Daniel Boz Deposition) at 68–9 & Exhibit 2 thereto (Contamination Assessment Report and Conceptual Remedial Action Plan prepared by Handex of Florida, Inc., October 31, 1989) at 24. Chrostowski also relies on testimony that, since 1974, Shell spilled approximately 250,000 gallons of gasoline and diesel fuel on its property in Jackson-

---

**42.** While objecting to portions of Verification of Dr. Sadat, Shell filed no such objection with respect to the Chrostwoski Verification.

**43.** Chrostowski defines landfarming as the "direct contamination by Shell or Gulf through disposal of tank residuals, contaminated water and other wastes on land." Chrostowski Verification at ¶ 16.

**44.** "Facilitated transport occurs when a heavy material such as a tank bottom is dissolved or rendered more mobile in the environment by

a lighter, more-mobile, more water-soluble material, such as gasoline, coming into contact with it. The gasoline will transport the heavier tank bottom material through the subsurface and, in fact, can transport it fairly long distances." Chrostowski Verification at ¶ 22.

**45.** Daniel Boz testified that his current title with Shell is "Manager of Real Estate Assets." Plaintiffs' Joint Exhibit 3 (Daniel Boz Deposition) at 12.

ville and that it had only recovered about 100,000 gallons. *See* Plaintiffs' Joint Exhibit 3 (Daniel Boz Deposition) at 52–53. Finally, Chrostowski relies on testimony by Mr. William Shepherd, a former Shell hydrogeologist, that the gasoline spill occurred "at the water table level" and the groundwater at that location moves to the south. Plaintiffs' Joint Exhibit 8 (William Shepard Depo.) at 51, 55–57.

Shell does not challenge Chrostowski's qualifications to render an expert opinion in this case. Rather, Shell argues that Chrostowski's opinion that the pipeline was the primary cause of contamination is not reliable because it is not based upon sufficient facts or data and it is not the product of reliable principles or methods. *See* Doc. 115 at 18–19. Shell also argues that Chrostowski impermissibly reaches legal conclusions in his expert report. *See id.* at 19–20.[46] In response, plaintiffs argue that Chrostowski's opinions are supported by sufficient facts and are based on his experience.

■ Chrostowski's opinion that contamination was caused by a direct release from the pipeline is nothing more than speculation. Chrostowski concedes that there is no evidence of a direct leak and there is no evidence showing that the materials in the salt marsh are the same as the product carried in the pipeline. *See* Chrostowski Depo. at 55, 57. Chrostowski merely reasons that because the pipeline is now broken it "would have leaked whatever it contained at the time it was broken and thereafter." Chrostowski Verification at ¶ 27. Because Chrostowski's conclusion that contamination was caused by a direct

release from the pipeline is devoid of any factual basis or scientific methodology, it is scientifically unreliable.

■ Likewise, Chrostowski's opinion that contaminants (i.e., tank bottoms and the "heavy black substance") migrated from Shell's property across Long Branch Creek to the salt marsh on Gulf's side is scientifically unreliable. First, Chrostowski speculates that the contaminants got into the groundwater on Shell's property. He reaches this conclusion without conducting any independent testing at the Shell facility and Chrostowski admits that he does not "have all the information [he] would like to have about the environment at the Shell facility." *See* Chrostowski depo. at 24–25.[47] Chrostowski has failed to identify any methodology that he used to reach this conclusion. As such, the Court is unable to determine whether the theory or technique can be tested, whether it has been subjected to peer review, whether it has a high known or potential rate of error and whether the theory has attained general acceptance within the scientific community. *See Allison,* 184 F.3d at 1312 (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97).

■ Second, Chrostowski speculates that these contaminants (which may have gotten into the groundwater) traveled across Long Branch Creek via facilitated transport. While contending his theory of facilitated transport is supported by a "substantial amount of scientific literature," he fails to cite or offer any such materials. However, even if this is a recognized theory of migration, Chrostowski

---

**46.** The Court declines to strike Chrostowski's opinion on this basis. If necessary, the Court will separate and disregard any legal conclusions reached by Chrostowski from his statements of fact and expert opinion.

**47.** Chrostowski relied on Shepard's testimony that the groundwater flows to the south.

Handex prepared a map showing that the direction of ground water flow varies throughout the property. *See* Bates Stamp # 1305–06, attached as part of Exhibit 2 to Plaintiffs' Joint Exhibit 3 (Daniel Boz Deposition). Chrostowski does not state that he relied on this map.

has failed to apply this theory to the facts of the case. He has not examined the pipeline or the pipeline bed to support his theory. Nor has he conducted any tests to forecast the flow of contaminants from the Shell side to the Gulf side. *See id.* at 39–40.[48] Moreover, Chrostowski testified that he is unable to identify any contamination that actually made it from Shell's landfarming operation to the water. *See id.* at 18–19. Chrostowski further testified that he could not hypothesize about how much of the "heavy black substance" made it across the creek because "this occurred a long time ago" and he does not "have a lot of knowledge about Long Branch Creek in the early 1970's." Chrostowski Depo. at 18,39–40, 216. Accordingly, "there is no information available to say to any degree of certainty that contaminants actually went from point 'A' to point 'B.'"[49] *Thomas v. FAG Bearings Corp.,* 846 F.Supp. 1382, 1394 (W.D.Mo.1994)(finding expert opinion on migration of contaminants via the groundwater was speculative because opinion was rendered without any factual data "about the nature or depth of the alleged contamination, the composition of the earth below the site, its proximity to the 'conceptual' underwater pathway or the amount of con-

taminants allegedly released"); *see also Kalamazoo River Study Group,* 171 F.3d at 1072–73 (affirming trial court's holding that the "inadequate factual basis" made the proposed expert's testimony that contaminants migrated from defendant's property to Lake Morrow "scientifically unreliable"). As such, the inadequate factual basis and lack of scientific methodology render Chrostowski's opinion that contaminants migrated from the Shell facility across Long Branch Creek to the salt marsh scientifically unreliable.[50]

In sum, the Court has found the proffered testimony of Mr. Grip, Dr. Sadat and Dr. Chrostowski inadmissible under Rule 702, Fed.R.Evid. and *Daubert.*[51] In doing so, the Court recognizes that these experts are all well-qualified in their respective fields. However, due to the passage of time and lack of evidence, these experts were forced to fill in too many blanks with speculation and conjecture for their opinions to be scientifically reliable. Nor did the experts conduct any of their own testing or subject their theories to the rigors of scientific analysis.[52] When asked to admit scientific evidence, the Court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scien-

**48.** Chrostowski testified that he did not create a formal hydological model but that his work on the creek over the years has given him an "understanding of the behavior of the creek." *Id.* at 39.

**49.** Chrostowski would likely be permitted to testify that these pathways are generally recognized in the scientific community. However, as discussed above, Chrostowski has no factual support for his opinion that in this case contaminants actually migrated via these pathways.

**50.** If considered on the motion for summary judgment, Chrostowski's opinion would create, at most, a question of fact as to whether or not there was a *possibility* that contaminants migrated from the Shell facility across

Long Branch Creek to the Gulf facility. Expert opinions based on speculation and conjecture are insufficient to create a genuine issue of material fact to survive summary judgment. *See Thomas,* 846 F.Supp. at 1393.

**51.** Plaintiffs cite William Hall's (Shell's expert) report and deposition testimony as supporting their experts' opinions. *See* Doc. 136. While the Court agrees that Hall is supportive of some of plaintiffs' theories, he provides no basis for bolstering the opinions of Mr. Grip, Dr. Sadat and Dr. Chrostowski concerning Shell's responsibility for the contamination.

**52.** Plaintiffs do not argue that the Court should consider other factors in determining whether these expert opinions are sufficiently reliable.

tist," *Rosen,* 78 F.3d at 318. The Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512. Because these opinions would not be admissible at trial, they cannot be used by plaintiff to create a genuine issue of material fact in opposing Shell's motion for summary judgment. *See Thomas,* 846 F.Supp. at 1394. While the Court does not lightly reach a decision to disallow plaintiffs' experts from testifying at trial and allowing the jury to weigh their opinions, the result reached here is required by the Court's "gatekeeping" role under *Daubert.*

 Based on the Court's ruling that plaintiffs' expert opinions are inadmissible and given that these expert opinions are necessary to establish a causal link between Shell's activities and the contamination, plaintiffs have failed to create a material issue of fact as to whether Shell caused or contributed to the contamination of the Site or salt marsh. Because this is a necessary element of each Count of the Second Amended Complaint brought against Shell, Shell's Motion for Summary Judgment is due to be granted.

## VI. Shell's Counterclaim Against Plaintiffs

Shell brought a counterclaim against plaintiffs seeking contribution under CERCLA § 107 if Shell was ultimately found liable in this action. *See* Doc. 63 at 25–26. Because the Court has determined that Shell's Motion for Summary Judgment (Doc. 116) is due to be granted, Shell's counterclaim against plaintiffs is moot.

## VII. Shell and Chevron Crossclaims

Shell crossclaimed against Chevron seeking contribution from Chevron on various grounds if Shell was ultimately found liable in this lawsuit. *See* Doc. 63 at 20–25. Chevron also crossclaimed against

Shell seeking contribution from Shell if Chevron was found liable in this action. *See* Doc. 69 at 12–13. Based on the Court's determination that Shell's Motion for Summary Judgment (Doc. 116) and Chevron's Motion for Summary Judgment (Doc. 118) are due to be granted, Shell's and Chevron's crossclaims are moot.

## VIII. Conclusion

I acknowledge the result I have reached here may seem anomalous. Chevron, the most likely source of the contamination in the salt marsh, is held, by operation of *res judicata,* to escape any responsibility for it. Shell, which *possibly* contributed in a much smaller way to the contamination, is also off the hook due to insufficiency of evidence. Plaintiffs NSC and GS & F, which almost certainly had *nothing* to do with the contamination, are left without apparent recourse. Nevertheless, the result I have reached here is my best effort to apply the law in a very difficult case. Accordingly, it is hereby

**ORDERED:**

1. Shell Oil Company's Counterclaim Against Plaintiffs Norfolk Southern Corporation and Georgia Southern and Florida Railway Company (Doc. 63) is **MOOT.**

2. Shell Oil Company's Crossclaim Against Co–Defendant Chevron U.S.A., Inc. (Doc. 63) is **MOOT.**

3. Chevron U.S.A., Inc.'s Crossclaim Against Co–Defendant Shell Oil Company (Doc. 69) is **MOOT.**

4. Shell Oil Company's Motion in Limine to Exclude the Opinion Testimony of Mr. Wayne Grip, Dr. Paul Chrostowski and Dr. Marwan Sadat (Doc. 114) is **GRANTED.**

5. Shell Oil Company's Motion for Summary Judgment (Doc. 116) is **GRANTED.**

6. Chevron U.S.A., Inc.'s Motion for Summary Judgment (Doc. 118) is **GRANTED.**

7. Chevron U.S.A., Inc.'s Motion for Summary Judgment on Crossclaim of Defendant Shell (Doc. 125) is **MOOT.**

8. Shell Oil Company's Motion to Strike the Plaintiffs' Late–Filed Expert Verification (Doc. 146) is **GRANTED.**

9. The Clerk shall enter Judgment in favor of defendants, Shell Oil Company and Chevron U.S.A., Inc., and against plaintiffs, Norfolk Southern Corporation and Georgia Southern and Florida Railway Company.

10. The Clerk shall **close** the file.

## APPENDIX A